**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **QUAD/GRAPHICS, INC.,** | ) | |
| | ) | |
| **Plaintiff/Counter-Defendant,** | ) | |
| | ) | |
| **v.** | ) | **No. 15 C 3439** |
| | ) | |
| **GRAPHIC COMMUNICATIONS** | ) | **Judge Rebecca R. Pallmeyer** |
| **CONFERENCE OF THE INTERNATIONAL** | ) | |
| **BROTHERHOOD OF TEAMSTERS** | ) | |
| **(GCC-IBT), NATIONAL PENSION PLAN,** | ) | |
| | ) | |
| **Defendant/Counter-Plaintiff.** | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiff Quad/Graphics, Inc. is a Wisconsin printing company and the successor to another printer, World Color, previously known as Quebecor World.[1] Some of Quad's employees were covered by a collective bargaining agreement that required Quad to make contributions to Defendant Graphic Communications Conference of the International Brotherhood of Teamsters National Pension Plan ("the Fund"), a defined-benefit pension plan that services the unionized printing industry. As World Color's successor, Quad is responsible for its liabilities, including money owed to the Fund as a penalty for partially withdrawing from the pension during a plan year. This case involves two such partial withdrawals: the first stems from the closure of four facilities, including one in Alden, Illinois ("the Alden partial withdrawal") during the 2006-2007 plan year, and the other relates to a closure in Memphis, Tennessee, during either the 2008-2009 or 2009-2010 plan year (this distinction is at the heart of the parties' dispute). Defendant Fund assessed Quebecor $12.4 million for the Alden partial withdrawal shortly before Quebecor filed for bankruptcy in January 2008. Quebecor gradually slowed down operations at its Memphis plant throughout 2008, and the facility finally shuttered in April 2009,

---

[1] Quebecor declared bankruptcy in 2008 and emerged from bankruptcy in 2009 with a new name: World Color. Quad/Graphics acquired World Color and assumed its liabilities on July 2, 2010. For the sake of simplicity, the court refers to all three companies as "Quad" except in instances where a distinction between the companies is relevant.

triggering another partial withdrawal liability ("the Memphis partial withdrawal"). By April 2011, Quad had shut down all of its remaining operations with employees covered by the Fund, causing a complete withdrawal.

Under the Multiemployer Pension Plan Amendments Act ("MPPAA"), 29 U.S.C. §§ 1381-1461, an employer's withdrawal liability is roughly equal to its proportionate share of the plan's "unfunded vested benefits." Where, as here, an employer has existing withdrawal liability, any additional liability that is assessed in a subsequent plan year must be reduced by the employer's pre-existing liability. The purpose of this reduction, or "credit," is to prevent employers from being double-charged. On December 15, 2011, Defendant assessed Quad $18,255,808 in withdrawal liability for the Memphis partial withdrawal and the complete withdrawal. That assessment gave Quad a partial credit for its Alden withdrawal liability, based on the fact that a portion of that liability would be discharged in bankruptcy (the exact amount is yet to be determined by the bankruptcy court). Quad moved to compel arbitration pursuant to § 4221 of the Employee Retirement Income Security Act ("ERISA") on two issues: (1) On what date did the Memphis partial withdrawal occur? (The timing is important because of Quebecor's July 2009 bankruptcy order.) (2) How much credit should Quad receive for the Alden withdrawal liability?

After a two-day hearing, the arbitrator's award (1) pegged April 30, 2010 as the date of the Memphis partial withdrawal and (2) determined that the Fund was required to reassess Quad's liability for that withdrawal, giving "100% credit for the Alden partial withdrawal liability." Quad subsequently filed this suit seeking to enforce the first part of the arbitration award and vacate or modify the second part. The Fund filed a counterclaim, seeking the opposite: the Fund agrees with the arbitrator that April 30, 2010 is the date of the Memphis partial withdrawal, but believes that allowing Quad full credit for the Alden withdrawal is improper. For the reasons stated below, the court enforces the arbitration award in its entirety.

2

## BACKGROUND

**I.    Factual history**

The arbitrator made detailed factual findings.  Those findings are not disputed and are set forth here in full:

Quebecor World (USA) was a commercial printing business that operated eight facilities in a number of different cities and states, including Alden and Memphis. The company employed workers, some of whom were covered by a collective bargaining agreement that required contributions to the Fund, a Taft-Hartley defined benefit pension plan.  The Fund's plan year runs from May 1 through April 30.

The Fund assessed withdrawal liability of $12.4 million against Quebecor for the partial withdrawals that occurred when four facilities, including Alden, ceased to operate in the 2006-2007 plan year.  In January, 2008 Quebecor filed for Chapter 11 bankruptcy and on December 4, 2008, the Fund filed a proof of claim

. . . against the Debtor for withdrawal liability, jointly and severally, with other Quebecor World controlled companies as a result of the Debtor's partial withdrawal and a contingent claim in the event that the Quebecor World controlled group permanently cease to have an obligation to contribute to the Fund.

Quebecor continued to employ photoengravers and electrician/machinists at its Memphis facility into 2008 and it made contributions to the Fund on their behalf. The contributions were required by Article 24 of the 2007-2012 collective bargaining agreement between Quebecor and the GCC/IBT Local 223M, which stated:

Effective during the pay week following the execution of this Agreement, the Company shall increase the amount of money equal to eight (8%) of the straight time weekly wages earned by each Employee covered by the Agreement to eight and sixteen one hundredths (8.16%) percent, and remit same to the . . . Fund . . . The term "wages" as used herein shall mean all monies earned by an Employee including pay for skill or merit premiums, shift differentials, holidays, vacations, and any other straight time wages paid under this Agreement.

In February, 2008, Quebecor shut down part of the Memphis facility and by November, 2008, it had made the decision to shut down the entire operation in 2009.  This plan was communicated to the leadership of the GCC, including President George Tedeschi, who was also the co-chair of the Fund Board of Trustees.

On December 17, 2008, Fund Counsel Peter Leff sent to Fund Administrator George Smetana proposed revisions in the Employer Withdrawal

3

Notice and Program Manual that had been under discussion. Each document contained a myriad of small changes that Smetana testified had been suggested by counsel and others for clarification. Among the changes were the insertion of two commas in Section III. Identification of Withdrawal Liability, which now read:

> 5. An employer will be deemed to have partially withdrawn from the Fund if, on the last day of a plan year, there is a 70 percent or greater contribution decline for such plan year or there is a partial cessation the employer's contribution obligation.
>
> > (a) The Fund office shall identify when a partial withdrawal has occurred. . .
> >
> > (b) The Fund office shall consult with Fund Legal Counsel if there is any question as to whether a partial withdrawal has occurred and an employer's specific withdrawal date. [underscoring added]

The Program Manual was ultimately sent to participating employers with the notation that it was effective May 1, 2008.

On March 3, 2009, Quebecor notified the 110 employees in Memphis, including six electricians, four machinists and nine photoengravers, as well as the Local 223M representative, that it expected to close the Memphis facility on April 16, 2009. Under the Worker Adjustment and Retraining Notification Act (WARN) (29 U.S.C. §2102(a)), companies with over 100 employees "shall not order a plant closing or mass layoff until the end of a 60-day period after the employer serves written notice of such an order." Section 2014(a) mandates that employers who give less than the requisite notice shall be liable for the back pay and benefits for the balance of the sixty days. Quebecor's notice to the affected employees stated that they would be permanently laid off effective the week of April 13, ". . . However, you will receive your full, straight time pay and benefits for the equivalent of your workweek through pay period ending May 3, 2009."

The last day of work for the remaining photoengravers was actually April 19, after which their work was transferred to a Quebecor facility that was not subject to Fund contributions. The final check for wages and benefits was issued on May 9. Vacation and personal day payments were also made on that day. Quebecor's last contribution to the Fund based on payments to employees in May, 2009, who were listed on the remittance report as having a termination date of May 3, was sent on June 2 and received on June 9, 2009.

On June 19 the Fund filed in Bankruptcy Court its objections to the treatment of the Alden claim in the latest Reorganization Plan. After discussions with the Fund's bankruptcy counsel, Quebecor's counsel sent the following email:

> Per our discussions, set forth below find the language we discussed for inclusion in the Confirmation Order. In addition, this will also confirm the Debtors' agreement to treat the Funds' unpaid withdrawal liability claims as Class 3 claims in an amount equal to 66% of the allowed amount of such claims. Finally, we will modify

the Plan to make it clear that the Debtors are not seeking to discharge future withdrawal liabilities. In this regard, please confirm that we have now resolved your objections so we can advise the Court accordingly.

Quebecor's counsel confirmed to the bankruptcy judge in a subsequent proceeding that the Plan had been modified to reflect that it was not the Debtor's intention to discharge any future withdrawal liability.

The Bankruptcy Court entered an order confirming the Reorganization Plan, as modified, on July 2, 2009. The Plan became effective on July 21, 2009, and after changing its name to World Color (USA), Quebecor emerged from bankruptcy. Except as provided for in the Plan, all claims, including those for which no proof of claim had been filed, were deemed to be satisfied, discharged, and released.

The Fund followed its usual practice of sending an Employer Withdrawal Liability Questionnaire to Quebecor on September 29, 2009 because it had ceased making contributions on behalf of the photoengravers' unit at Memphis. During the balance of the 2009-2010 plan year, World Color continued to make contributions to the Fund on behalf of two members of the Machinist/Electrician unit in Memphis and covered employees at other facilities. On July 2, 2010, Quad/Graphics acquired World Color and assumed its liabilities.

Between December, 2010 and April, 2011, Quad ceased employing the two remaining people in Memphis, and shut down covered operations in its Jonesboro and Waukee facilities, triggering a complete withdrawal from the Fund. On December 15, 2011, the Fund assessed Quad $18,255,808 in withdrawal liability for the Memphis partial withdrawal and the complete withdrawal. The Memphis partial withdrawal was deemed to have occurred in the May 1, 2009 to April 30, 2010 plan year.

The total assessment was calculated giving Quad 100% credit for the Alden partial assessment, pursuant to the Fund's reading of 29 U.S.C. §1386(b)(1). Quad submitted a Request for Review on March 13, 2012. Reasoning that it expected to receive only 66% of the withdrawal liability assessed for the Alden partial withdrawal, the Fund reduced the Alden credit to 66%, resulting in an increase in the total assessment to $19,805,362.

(Arbitration Award, Ex. K to Arbitration Record, hereinafter "AR," at 2-6.)

## II.    Procedural history

Quad issued an arbitration demand on November 21, 2013, pursuant to § 4221 of ERISA. (Ex. A to Arbitration Record, hereinafter "AR.")  The parties proceeded to arbitration, and a two-day hearing was held before an arbitrator on November 18 and 19, 2014. Based on the factual findings set forth above, the arbitrator entered an award favorable to the Fund in one

respect, but favorable to Quad in another. Specifically, the arbitrator reached the following conclusions:

> The Memphis partial withdrawal occurred on April 30, 2010, the last day of the 2009-2010 plan year. The Fund acted properly under MPPAA in assessing partial withdrawal liability based on that date.

> The Fund erred by failing to give Quad full credit for the Alden partial withdrawal liability. The Fund shall reassess Quad's Memphis partial withdrawal liability and the subsequent complete withdrawal liability giving 100% credit for the Alden partial withdrawal liability. A new payment schedule shall be developed, taking into account the interim payments already made by Quad.

(Arbitration Award, Ex. K to AR, at 1.)

Quad filed this suit in April 2015, seeking to enforce in part and vacate in part the award. Specifically, Quad takes issue with the arbitrator's conclusion that its Memphis partial withdrawal occurred on April 30, 2010. It argues that the withdrawal occurred months earlier, when the Memphis plant ceased operations. Quad agrees with the arbitrator, however, that it should receive full credit for its Alden withdrawal. The Fund filed a counterclaim, seeking to enforce the part of the arbitrator's award placing the Memphis withdrawal on April 30, 2010, but asking that the court vacate or modify the arbitrator's conclusion that Quad is entitled to full credit for its Alden liability.

## <u>DISCUSSION</u>

### I. Standard of Review

An arbitrator decides facts by a preponderance, and his findings of fact may be set aside only if clearly erroneous. *See Jos. Schlitz Brewing Co. v. Milwaukee Brewery Workers' Pension Plan*, 3 F.3d 994, 999 (7th Cir. 1993) (interpreting 29 U.S.C. § 1401(c)). The same standard holds for the arbitrator's application of law to fact. *Id.*; *Chicago Truck Drivers Pension Fund v. Louis Zahn Drug Co.*, 890 F.2d 1405, 1409-1411 (7th Cir. 1989). But the arbitrator's legal conclusions are subject to *de novo* review. Id.; *Trustees of Iron Workers Local 473 Pension Trust v. Allied Products Corp.*, 872 F.2d 208, 211-212 (7th Cir. 1989).

The arbitrator's award here hinged on the interpretation of two sections of the MPPAA: 29 U.S.C. §§ 1385 and 1386. The basic facts of the case are not in dispute. These are questions of law, which the court will review *de novo.*

## II. The Memphis partial withdrawal occurred on April 30, 2010

The arbitrator found that the Memphis partial withdrawal was effective on April 30, 2010, the last day of the 2009-2010 plan year. Quad argues, however, that the actual date of withdrawal was May 3, 2009, the date on which its obligation to contribute on behalf of its Memphis employees ceased. For support, it points to the statutory language of 29 U.S.C. §§ 1385(a)-(b).

Section 1385(a) states, in relevant part, that "Except as otherwise provided in this section, there is a partial withdrawal by an employer from a plan on the last day of a plan year if for such plan year—(1) there is a 70-percent contribution decline, or (2) there is a partial cessation of the employer's contribution obligation." 29 U.S.C. § 1385(a). Section 1385(b)(2) goes on to provide that:

> [t]here is a partial cessation of the employer's contribution obligation for the plan year if, during such year—
>
>> (i) the employer permanently ceases to have an obligation to contribute under one or more but fewer than all collective bargaining agreements under which the employer has been obligated to contribute under the plan but continues to perform work in the jurisdiction of the collective bargaining agreement of the type for which contributions were previously required . . . or
>>
>> (ii) an employer permanently ceases to have an obligation to contribute under the plan with respect to work performed at one or more but fewer than all of its facilities, but continues to perform work at the facility of the type for which the obligation to contribute ceased.

Subsections (c) and (d) describe special treatment applicable to plans covering the retail food industry and to particular types of pension plans not relevant here.

The arbitrator concluded that a partial withdrawal must be deemed to have occurred on the last day of a plan year if there has been a 70% contribution decline or a partial cessation

during that year. Quad disagrees with this interpretation. It argues that the phrase "the last day of a plan year" in § 1385(a) "has no application in the partial cessation context because of the prefatory language . . . : 'Except as otherwise provided in this section . . . .' It is 'otherwise provided' in subsection (b)(2) . . . that a partial cessation withdrawal occurs 'during' a plan year." (Pl.'s Opening Br. [21] at 12.) In other words, Quad understands § 1385 to establish different occurrence dates for withdrawals triggered by a 70% decline in contributions (the "last day" of the plan year) and for partial cessation withdrawals ("during" the plan year at the moment of the cessation).

This is an unnecessarily tortured reading of the law. As the arbitrator noted, a "far more reasonable reading of the statute is that the [prefatory language] refers to the special treatment afforded the retail food industry in [1385](c) and a 26 U.S.C. § 404(c) plan in [1385](d)." (Arbitration Award at 10.) The arbitrator's interpretation is also supported by the legislative history of § 1385. The relevant committee reports from both the House and Senate stated that "whenever an event giving rise to a partial withdrawal occurs, the date of the partial withdrawal would be the last day of the plan year in which the event takes place." House Committee on Education and Labor, 96th Cong., Legis. Hist. of Pub. L. No. 96-364: Multiemployer Pension Plan Amendments (Comm. Print Feb. 18, 1980), 1980 WL 355713 at *9; Subcommittee on Private Pension Plans and Employee Fringe Benefits of the Senate Finance Committee, Pension Benefit Guaranty Corporation Plan Termination Insurance for Multiemployer Pension Plans. 96th Cong., Legis. Hist. of Pub. L. 96-364 (Comm. Print March 14, 1980), 1980 WL 355715 at *12.

Quad has consistently argued that the Fund was motivated by a desire to maximize the assessed liability by bringing the partial withdrawal date past the bankruptcy discharge in July 2010. As Quad sees things, the Fund is "attempting to assert an incorrect interpretation of ERISA [to] impair the Debtor's entitlement to the benefits of the 'fresh start' intended by Congress . . . under the Bankruptcy Code." (Pl.'s Opening Br. at 20.) But, as the Fund points

8

out, it believes that the Memphis partial withdrawal arose after confirmation of the reorganization plan here. (Def.'s Reply Br. at 2.) Thus, although nothing in ERISA shall be construed to "alter, amend, modify, invalidate, impair, or supersede" any law or regulation of the United States, 29 U.S.C. §114(d), the Fund's interpretation of § 1385 is irrelevant to Quad's bankruptcy.

Finally, Quad argues that if the court determines that partial withdrawals can occur only on the last date of a plan year, then the Memphis partial withdrawal occurred April 30, 2009, the last date of the 2009 plan year. (Pl.'s Opening Br. at 26.) Quad relies on the language in ERISA § 4205(a) and (b)(2)(A)(i); those provisions state that partial withdrawal occurs when the employer ceases to have an obligation to contribute, not when the employer ceases to make payments. But even if the court agrees with Quad that the partial withdrawal occurs when the obligation to contribute ceases, then the partial withdrawal still occurred in the 2009-2010 plan year because Quad's obligation to contribute to the fund continued until the employees received their final check for wages and benefits on May 9, 2009.

The arbitrator correctly concluded that the Memphis partial withdrawal occurred on April 30, 2010, the final day of the 2009-10 plan year. That aspect of the arbitration award will be enforced.

### III. Quad is entitled to 100% credit for the Alden partial withdrawal

The arbitrator also determined that "[t]he Fund erred by failing to give Quad full credit for the Alden partial withdrawal liability," even though a significant portion of that liability will be discharged in Quebecor's pending bankruptcy. (Arbitration Award at 1.) The Fund objects, arguing that Quad should receive credit only for the percentage of the Alden liability that actually gets paid off through the bankruptcy process (i.e., the portion that is not discharged). (Def.'s Opening Br. [28] at 36.) For its part, Quad insists that enforcing the arbitration award is the only way to honor the bankruptcy process. It argues that anything less than full credit for the Alden liability, regardless of how much of that debt is actually paid, would essentially render Quad liable for debts discharged in bankruptcy. (Pl.'s Reply Br. [30] at 28.)

The disputed statutory text comes from 29 U.S.C. § 1836(b)(1), which states, in relevant part, as follows:

> In the case of an employer that has withdrawal liability for a partial withdrawal from a plan, any withdrawal liability of that employer for a partial or complete withdrawal from that plan in a subsequent plan year shall be reduced by the amount of any partial withdrawal liability (reduced by any abatement or reduction of such liability) of the employer with respect to the plan for a previous plan year.

Neither this statute nor the relevant regulations—29 C.F.R. § 4206, *et seq.*—explicitly address the intersection between the ERISA/MPPAA and bankruptcy law that is presented here. But § 4206.1 does clarify that "[t]he purpose of the credit [for previous liabilities] is to protect a withdrawing employer from being charged twice for the same unfunded vested benefits of the plan. The reduction in the credit protects the other employers in the plan from becoming responsible for unfunded vested benefits properly allocable to the withdrawing employer."

As the Fund points out, the enforcement of the arbitrator's ruling would run afoul of this purpose: other employers will become responsible for vested benefits that are unfunded as a result of Quad's withdrawals. (Def.'s Opening Br. at 38.) Defendant argues that Congress included in § 1386(b)(1) a mechanism to avoid this exact outcome, by requiring that an employer's credit for previous withdrawal liability be "reduced by any abatement or reduction of such liability." The discharge of Quad's debt in bankruptcy, the Fund contends, is just such a reduction.

The arbitrator was not persuaded by this reading. He concluded that "[t]he parenthetical statement that the credit shall be reduced by any abatement or reduction of such liability is inapplicable here [because t]he Fund never abated or reduced the Alden liability, [r]ather the claim for payment of the assessment was discharged." (Arbitration Award at 17) In other words, "the total amount of partial withdrawal liability attributable to the Alden partial withdrawals was not extinguished, the Fund merely lost the ability to sue to collect the full amount."

Instead, the arbitrator's award hinged on "the express language of the statute[, which] states that the withdrawal liability for a subsequent partial or complete withdrawal shall be

reduced by the *amount of any partial withdrawal liability.* It does not say reduced by the *amount paid of any partial withdrawal liability.*" (*Id.* (emphasis in original).) This court is unwilling to conclude that the statute "express[ly]" supports the arbitrator's conclusion. For instance, the arbitrator's interpretation relies, without support, on the notion that an "abatement or reduction" is relevant under § 1386 only if it is executed by the Fund. (*Id.* (finding that the reduction of a liability credit is "inapplicable" here because "[t]he Fund never abated or reduced" Quad's liability).)

The court nevertheless agrees with the arbitrator's ultimate conclusion. There is here an inherent conflict between the respective purposes of ERISA and bankruptcy law. As the arbitrator acknowledged, the regulatory guidance of 29 C.F.R. § 4206 does not address "the intersection of a discharged claim for partial withdrawal liability and the proper application of the credit to be given in the event of a subsequent partial or complete withdrawal." (*Id.*) Nor does the legislative history suggest that Congress ever contemplated the situation presented in this case. What is clear, however, is that the court must choose between frustrating either (1) the purpose of ERISA/MPPAA as described in § 4206, or (2) the general principle that bankruptcy "discharges the debtor from any debt that arose before the date" that its plan is confirmed, 11 U.S.C. § 1141(d)(1). The Fund argues that reducing Quad's liability credit would not technically conflict with the purpose of bankruptcy law: "The Alden partial [withdrawal liability] is discharged and the Fund cannot collect on it. But, the subsequent withdrawals, the Memphis partial and the complete withdrawal, are post-bankruptcy withdrawals . . . not subject to discharge. [T]he credit is merely an amortized offset to future withdrawal liability based on prior assessed withdrawal liability." (Def.'s Opening Br. at 39.) This argument is unpersuasive. Allowing creditors to sidestep the bankruptcy process by increasing debtors' post-bankruptcy liabilities to account for discharged debts would defeat the goal of bankruptcy. Tellingly, the Fund does not cite to a single case or statute to support its position.

11

Given the conflict between ERISA (as amended by the MPPAA) and bankruptcy law, the court's choice is simple. Congress instructed that ERISA be construed such that it would not "alter, amend, modify, invalidate, impair, or supersede any law of the United States." 29 U.S.C. § 1144(d). Giving Plaintiff less than 100% credit for its Alden liability would do just that by effectively reanimating discharged debt, thereby significantly impairing bankruptcy law. The court enforces the arbitration award's conclusion that "[t]he Fund erred by failing to give Quad full credit for the Alden partial withdrawal liability." The Fund must reassess Quad's Memphis partial withdrawal liability and the subsequent complete withdrawal liability by giving Quad 100% credit for the Alden partial withdrawal liability.

## **CONCLUSION**

The court upholds the arbitration award in its entirety. Plaintiff's motion to enforce the award in part [21] is granted, as is Defendant's motion to enforce, in part, the arbitration award [28]. Both parties' motions are denied to the extent that they seek to vacate or modify, in part, the arbitration award.

ENTER:

Dated: September 30, 2016

_____

REBECCA R. PALLMEYER
United States District Judge